**BUTLER v. KAVANAGH, Collector of Internal Revenue.**

No. 4018.

District Court, E. D. Michigan, S. D.

Dec. 12, 1945.

Roman F. Glocheski and L. K. Varnum, both of Grand Rapids, Mich., for plaintiff.

John C. Lehr, U. S. Atty., and Morris Zwerdling, Asst. U. S. Atty., both of Detroit, Mich., and Frederic G. Rita, Sp. Asst. Atty. Gen., for defendant.

MOINET, District Judge.

The plaintiff sues to enjoin the threatened assessment and collection of taxes under Section 2300 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 2300.

The plaintiff manufactures and sells a product which he calls soya butter. Soya butter is produced by churning hydrogenated soya bean oil to which is added carotene and imitation butter flavor in a fluid obtained by soaking soya beans in water and pressing out the liquid. Carotene is an essence derived from carrots which, in addition to fortifying the product with Vitamin A, gives it the golden yellow color of creamery butter.

The defendant, as Collector of Internal Revenue, has notified the plaintiff that his product is oleomargarine as defined by Section 2300 of the Internal Revenue Code, and that it is, therefore, subject to tax at 10 cents per pound as yellow oleomargarine. The Collector has further notified the plaintiff, as a consequence of this determination, that his product must also be labeled as oleomargarine, as provided by the statute.

In the fall of 1942, at about the time the plaintiff began manufacturing this product, he submitted a sample of it to the Commissioner of Internal Revenue with a request for his ruling as to whether or not it was taxable as oleomargarine. By letter dated November 13, 1942, plaintiff was advised as follows:

"This office is now in receipt of the report of the laboratory in which it is stated that an examination of the sample shows:

| | |
|---|---|
| Index of refraction | 1.4667 |
| Color reading Y/R | 3.1 |
| Water | 16.70 |

This product has a color reading in excess of 1.6 red plus yellow with a melting point under 118° Fahrenheit and is therefore classed as colored oleomargarine and subject to tax at the rate of 10 cents per pound as provided by section 2301(a) of the Internal Revenue Code."

At the same time, the plaintiff inquired of the Food and Drug Administration for information on the application of the Federal Food, Drug, and Cosmetic Act, 21 U.S. C.A. § 301 et seq., to his product, informing the Food and Drug Administration that the product was to be used in place of butter and that the Bureau of Internal Revenue had classified it as oleomargarine. As a result of this application, the Commissioner of Food and Drugs, by letter dated October 31, 1942, informed the plaintiff as follows:

"It is our understanding that you are familiar with the standard for oleomargarine promulgated under the terms of the Federal Food Drug and Cosmetic Act. The product you describe is not in conformity with that standard and cannot be sold as oleomargarine within the jurisdiction of that act. Section 403(g) of the Act, which you will find on page 16 of the circular F.C.A. No. 1 which was furnished you at the time of your visit, provides that a food is misbranded if it purports to be or is represented as a food for which a definition and standard of identity has been prescribed unless it conforms to such definition and standard. With a designation of the product as oleomargarine, as required by the oleomargarine law, obviously the product will be represented as oleomargarine and will be in conflict with this provision of the Food, Drug and Cosmetic Act.

Section 701(e) of the Food, Drug and Cosmetic Act states that the conditions under which consideration can be given to the

amendment or revision of existing standards. The validity of the present standard for oleomargarine is now before the United States Circuit Court of Appeals for the 8th Circuit for decision. It would seem to us that any consideration of proposals to amend or revise the standard should await the outcome of such litigation."

Section 401 of the Federal Food, Drug and Cosmetic Act of 1938, 52 Stat. 1046, 21 U.S.C.A. § 341, provides that: "Whenever in the judgment of the Secretary (Administrator) such action will promote honesty and fair dealing in the interest of consumers, he shall promulgate regulations fixing and establishing for any food, under its common or usual name so far as practicable, a reasonable definition and standard of identity, a reasonable standard of quality, and/or reasonable standards of fill of container * * *. In prescribing a definition and standard of identity for any food or class of food in which optional ingredients are permitted, the Secretary (Administrator) shall, for the purpose of promoting honesty and fair dealing in the interests of consumers, designate the optional ingredients which shall be named on the label * * *."

Section 701(e) of the Act provides that the Administrator "shall hold a public hearing upon a proposal to issue, amend, or repeal any regulation contemplated by" section 401 of the Act; that at the hearing "any interested person" may be heard in person or by his representative; that, as soon as practicable after completion of the hearing, the Administrator shall by order make public his action or his decision not to act; and that his order shall be based only on substantial evidence of record at the hearing and shall set forth the detailed findings of fact on which the order is based.

Subsection (f) of Section 701 of the Act provides that "in a case of actual controversy as to the validity of any order" under subsection (e) of Section 701, "any person who will be adversely affected by such order if placed in effect" may, within ninety days after its issuance, file a petition with the Circuit Court of Appeals of the United States for the Circuit in which he resides or has his principal place of business "for a judicial review of such order"; that "the court shall have jurisdiction to affirm the order, or to set it aside in whole or in part, temporarily or permanently"; that "if the order of the Secretary (Administrator) refuses to issue, amend, or repeal a regula-

tion and such order is not in accordance with law the court shall by its judgment order the Secretary (Administrator) to take action, with respect to such regulation, in accordance with law"; and that "the findings of the Secretary (Administrator) as to the facts, if supported by substantial evidence, shall be conclusive." Subsection (f) of Section 701 also provides that "the remedies provided for in this subsection shall be in addition to and not in substitution for any other remedies provided by law."

 The proceeding under the statute to test the validity of the standard for oleomargarine adopted by the Food and Drug Administration, mentioned in the Commissioner's letter to the plaintiff, quoted above, resulted in approval of the standard. See Land O'Lakes Creameries v. McNutt, 8 Cir., 132 F.2d 653. The plaintiff disregarded the suggestion of the Acting Commissioner that he apply for modification of the standard and never made any such application. If the plaintiff is dissatisfied with the standard now in force, he had his remedy under the statute and has failed to avail himself of it. If he is dissatisfied with the Commissioner's ruling upon his product under that standard, he is without remedy here. In any event, the Federal Security Administrator is not a party to this action and the only question presented by the pleadings for my determination is whether the ruling of the Commissioner and the defendant-Collector, that the plaintiff's product is oleomargarine, was erroneous. Oleomargarine is defined by Section 2300 of the Internal Revenue Code as follows:

"Sec. 2300. Oleomargarine defined.

"For the purposes of this chapter, and of sections 3200 and 3201, certain manufactured substances, certain extracts, and certain mixtures and compounds, including such mixtures and compounds with butter, shall be known and designated as 'oleomargarine,' namely: All substances known prior to August 2, 1886, as oleomargarine, oleo, oleomargarine oil, butterine, lardine, suine, and neutral; all mixtures and compounds of oleomargarine, oleo, oleomargarine oil, butterine, lardine, suine, and neutral; all lard extracts and tallow extracts; and all mixtures and compounds of tallow, beef fat, suet, lard, lard oil, fish oil or fish fat, vegetable oil, annatto, and other coloring matter, intestinal fat, and offal fat;— if (1) made in imitation or semblance of

butter, or (2) calculated or intended to be sold as butter or for butter, or (3) churned, emulsified, or mixed in cream, milk, water, or other liquid, and containing moisture in excess of 1 per centum or common salt. This section shall not apply to puff-pastry shortening not churned or emulsified in milk or cream, and having a melting point of one hundred and eighteen degrees Fahrenheit or more, nor to any of the following containing condiments and spices: salad dressings, mayonnaise, dressings, or mayonnaise products nor to liquid emulsion, pharmaceutical preparations, oil meals, liquid preservatives, illuminating oils, cleansing compounds, or flavoring compounds."

██ Since the plaintiff's product is made from hydrogenated soya bean oil which concededly is a vegetable oil, it is oleomargarine if it is within any of the three conditions enumerated in the definition quoted above and I find that the plaintiff's product is clearly within two of these conditions. First, it is made in imitation or semblance of butter. The product was exhibited upon the trial and in color, odor and general appearance seemed to be undistinguishable from creamery butter. The advertising matter used by the plaintiff in promoting its sale stressed its resemblance to butter and the plaintiff, in a letter to a prospective customer, stated—"it looks and tastes like a fine dairy butter."

Soya butter is also squarely within the third condition, in that it is "churned, emulsified, or mixed in cream, milk, water, or *other liquid, and containing moisture in excess of 1 per centum or common salt.*" (Italics supplied.)

It is true that under the Oleomargarine Act, as originally enacted, Oleomargarine Act of August 2, 1886, 24 Stat. 209, and as amended by the Act of May 9, 1902, 32 Stat. 194, a product containing no animal matter was not oleomargarine as defined by the statute. Miller v. Standard Nut Margarine Co. 284 U.S. 498, 52 S.Ct. 260, 76 L.Ed. 422. In that case, the Supreme Court held that a product composed entirely of vegetable oils was not oleomargarine within the statutory definition and enjoined the collection of the tax.

But, in the statute under which that case was decided, there was a hyphen in the phrase "vegetable-oil" which, by the Act of July 10, 1930, 46 Stat. 1022, was eliminated and a comma inserted after the word "oil" and before the word "annatto". The Court

pointed out (pages 507, 508 of 284 U.S., 52 S.Ct. 260, 76 L.Ed. 422) that "vegetable oil, annatto" was a well-known coloring agent used for coloring butter and cheese and which was then being used to make oleomargarine resemble butter.

██ The legislative history of the Act of 1930 shows the unmistakable intent of Congress to make taxable as oleomargarine vegetable compounds. In H.Rep. No. 3, 71st Congress, 1st Sess., on the amendment to the Oleomargarine Act H.R. 6, which became the Act of July 10, 1930, c. 882, 46 Stat. 1022, the following statement appears: "This bill repeats and reenacts into law section 2 of the act approved August 2, 1886, as amended, which act defines butter and oleomargarine, and provides for taxation of adulterated butter and oleomargarine and the conditions under which these products may be made and sold, with a number of changes for the purpose of making this statute fit conditions in the butter and oleomargarine industry brought about by the discovery of new processes and materials, and by changes in methods of manufacturing."

Briefly stated the changes which are provided for are as follows: "* * * In line 18 of the printed bill a comma has been added between the term 'vegetable oil' and the word 'annatto.'. This is to correct a situation which arose because in the engrossed copy of the act of 1886, as amended, this comma was omitted. The context as well as the facts at that time and now clearly indicate that the comma is connoted at this place, and it appeared in the informal copies of the original act as it was considered by the committee and on the floor at that time. That is, vegetable oil is one substance, and annatto is another and entirely different one, whose use is for the purpose of coloring anything with which it is mixed to a yellow color like the natural color of butter."

The legislative history of this Act was so interpreted by the Supreme Court in Miller v. Standard Nut Margarine Co., supra, 284 U.S. page 508, 52 S.Ct. page 263, 76 L.Ed. 422, where it was said: "The legislative history and passage of the amendatory act of 1930 show that the Commissioner as well as the Congress found that an enlargement of the definition was necessary in order to cover products such as respondent's. The language used in the original act was not sufficiently clear and

definite to include products containing no animal fat. * * *"

I, therefore, find and decide that the plaintiff's product, soya butter, is oleomargarine as defined by Section 2300 of the Internal Revenue Code and since it is yellow in color, I hold that it is subject to tax at the rate of 10 cents per pound under Section 2301 of the Internal Revenue Code.

The plaintiff contends that even if his product is oleomargarine as defined by Section 2300, the Act is unconstitutional, because it violates the Fifth Amendment to the Constitution. This contention cannot stand with my ruling that the plaintiff's product is oleomargarine as the Supreme Court has upheld the constitutionality of the statute in McCray v. United States, 195 U.S. 27, 24 S.Ct. 769, 49 L.Ed. 78, 1 Ann. Cas. 561, and the validity of the statute is no longer open to challenge upon that ground.

The plaintiff further contends that the enforcement of the statute constitutes an interference with the practices and exercise of his religion and, therefore, violates the First Amendment to the Constitution. The complaint alleges that the plaintiff manufactures this product for the use of himself and members of the sect known as Seventh Day Adventists, of which he is a member, and whose religious beliefs and practices prevent them from eating any meat, fish, milk, butter or other animal matter; that to conform to the standard set by the Food and Drug Administration he would be required to add milk, which would be animal matter; and the plaintiff and his coreligionists will be prevented from having any spread for their bread, thus preventing them from the free exercise and practice of their religious beliefs. The testimony of the plaintiff and others called by him to establish the teaching of the Seventh Day Adventists upon the subject makes abstinence from animal matter desirable rather than obligatory. The Seventh Day Adventists were an established sect many years before the plaintiff attempted to manufacture soya butter and they apparently have been able not only to practice their religion but promote its growth without soya butter. The fact that the plaintiff keeps a substantial dairy herd is hardly consistent with his claim that milk and milk products are forbidden to those of his professed religious belief.

The First Amendment to the Constitution, so far as here material, provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

Obviously, no religion is established by the oleomargarine tax law, nor does the law, on its face, interfere with the free exercise of any religion. In Shapiro v. Lyle, D.C.W.D.Wash., 30 F.2d 971, a suit to enjoin the Prohibition Administrator from restricting the amount of wine permitted to those of the Jewish faith for sacramental purposes, it was held that such a regulation was not a deprivation of the free exercise of religion and the court said (page 973 of 30 F.2d):

"The contention that the National Prohibition Act [27 U.S.C.A. § 1 et seq.] is a deprivation of the free exercise of religion by restricting the delivery of unlimited use of wine, and is contrary to the constitutional guaranty of religious freedom, is, as said by the Supreme Court in Mormon Church v. United States, supra, 136 U.S. 1, at page 49, 10 S.Ct. 792, 805, 34 L.Ed. 481, altogether a sophistical plea:

" 'No doubt the Thugs of India imagined that their belief in the right of assassination was a religious belief; but their thinking so did not make it so. The practice of suttee by the Hindu widows may have sprung from a supposed religious conviction. The offering of human sacrifices by our own ancestors in Britain was no doubt sanctioned by an equally conscientious impulse. But no one, on that account, would hesitate to brand these practices now as crimes against society, and obnoxious to condemnation and punishment by the civil authority.' "

The plaintiff does not here contend that soya butter is used for sacramental purposes in his religion but only as an ordinary article of diet. Other sects might, with equal basis, assert that a tax on fish would interfere with their religious practices.

I have adopted the findings of fact and conclusions of law proposed by the defendant and judgment will accordingly be for the defendant, dismissing the complaint.