**Richard W. RAYES, Plaintiff,**

v.

**John EGGARS, Sgt. King, Dan Schumucher, Mike Kenney, P.A. Danaher, Frank Hopkins, Corp. Kipper, Don Williams, and Corp. Stoner, Defendants.**

No. 4:CV 92–3287.

United States District Court, D. Nebraska.

Nov. 18, 1993.

Michael R. Dunn, Halbert & Dunn, Falls City, NE, for plaintiff.

Don Stenberg, Atty. Gen., Terri M. Weeks, Asst. Atty. Gen., Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, District Judge.

Plaintiff is a prisoner in state custody who brings this action pursuant to 42 U.S.C. § 1983. Defendants have filed a motion for summary judgment (Filing 39) supported by numerous affidavits (Filing 40 and Exs. 1–42).[1] Plaintiff's two main complaints are: (1) that feeding him something called nutri-loaf was contrary to his religious beliefs and violated the First Amendment; and (2) that after serving him nutri-loaf, the defendants, in violation of the Eighth Amendment, refused to treat his serious medical needs when he became ill after refusing to consume the offending food. Finding that there are no material facts in dispute and that the law does not favor Plaintiff's complaints, I will grant Defendants' motion for summary judgment.[2]

### I.

As required by NELR § 56.1, the undisputed facts of this case are set out in the first twenty-six pages of Defendants' brief and are predicated on numerous affidavits and exhibits. (Filing 40 Index of Exs. 1–40.) Plaintiff, through his counsel, does not dispute any of the facts pursuant to NELR § 56.2, but argues that a finder of fact could draw inferences from those facts which would support Plaintiff's claims. With this background, I

---

1. Exhibit 1 was inadvertently omitted from the original filing. Defendants have now supplied a copy of exhibit 1 which has been added to filing 40.

2. A related state-law claim must also be dismissed as a consequence.

shall briefly summarize[3] the material facts, all of them uncontroverted, necessary for resolution of the motion for summary judgment:

1. Plaintiff is an inmate housed in the control unit of the Nebraska State Penitentiary (NSP). (Filing 40, Ex. 11, ¶ 5.)

2. The control unit is a special unit devoted to dealing with inmates who pose a special threat to other individuals, staff, inmates or state property, and it is denominated a maximum security area. (Filing 40, Ex. 1, ¶ 6.)

3. Defendants are employees of the State of Nebraska and include the warden (Hopkins); the unit manager of the control unit (Eggars); a sergeant (King); a case worker in the control unit (Schumucher); a deputy warden (Kenney); a physician's assistant (Danaher); a corporal (Kipper); a mental health counselor (Williams); and a person described simply as an employee (Stoner). (Filing 16 ¶¶ 6–15.)

4. Others involved in this case, but who are not defendants, are the food service director (Taylor) and the religious coordinator, sometimes called the chaplain (Rosenau). (Filing 40, Ex. 8, ¶ 1; Ex. 9, ¶ 1.)

5. Inmates at NSP have access to acute medical emergency care twenty-four hours a day, seven days a week. (Filing 40, Ex. 1, ¶ 11.)

6. Because of security concerns regarding inmates in the control unit, medical staff come to the control unit to conduct sick call from 12:00 noon to 2:00 p.m., Monday, Wednesday and Friday. (Id., ¶ 14.)

7. When there is no sick call at the control unit (Tuesday, Thursday, Saturday, and Sunday), a qualified health care employee visits the control unit to review inmate requests ("kites") for medical attention. (Id., ¶¶ 14, 17.)

8. Even if a request for treatment is made informally by an inmate through the control unit staff, without a "kite," the medi-cal staff will review the request and make a determination as to whether treatment is needed. (Id., ¶ 18.)

9. If as a result of sick call or the screening of "kites" or oral requests for treatment the medical staff determines that a visit to the clinic situated at NSP, but outside the control unit, is necessary, the inmate will be transferred there for closer examination. (Id., ¶ 14.)

10. The medical department maintains standard medical records on each inmate. (Id., ¶ 15.)

11. NSP has a highly developed inmate grievance system, including an "emergency" grievance system. (Id., ¶¶ 19–26.)

12. From time to time, NSP must deal with inmates who throw or otherwise abuse food or eating utensils. (Id., ¶¶ 27–28.)

13. In certain cases, NSP will feed an inmate something called "nutri-loaf"[4] on a styrofoam plate, without eating utensils, in lieu of regular food served with the usual eating utensils. (Id., ¶¶ 31, 37–38.)

14. Nutri-loaf is a nutritious "loaf" of food which provides all necessary dietary requirements. It is essentially an amalgam of different foods blended together. Nutri-loaf is served hot three times a day as a substitute for regular food. (Id., ¶ 38.)

15. Nutri-loaf is not used to punish inmates, but it is used as a device to control their behavior regarding food. (Id., ¶ 31.)

16. For example, if an inmate refuses to return an eating utensil, prison regulations provide that the inmate can be fed nutri-loaf, if approved by the warden and the medical department, for periods of time generally not to exceed nine consecutive meals. However, if an inmate again abuses food, the inmate may receive a total of 21 consecutive meals of nutri-loaf upon approval of the warden and the medical department. (Id., ¶¶ 32, 38.)

17. A nutri-loaf feeding regimen will not be started unless a misconduct report is is-

---

**3.** Plaintiff's affidavit (Filing 43) does not contradict the facts set out in this memorandum.

**4.** This food is sometimes called "nutraloaf." *LeMaire v. Maass,* 2 F.3d 851, 861 (9th Cir.1993) (feeding nutraloaf did not violate the Eighth Amendment). It is commonly used by prisons as a control device to deal with prisoners who throw or otherwise abuse food or eating utensils. *Id.*

sued, the medical department approves the nutri-loaf restriction after reviewing the medical files, and the warden or the warden's designate approves the use of nutri-loaf. (Id., ¶¶ 29, 32–35.)

18. NSP's religious programs are supervised by a qualified and trained employee who has the endorsement of the particular religious faith the employee subscribes to. (Id., ¶¶ 39, 40.)

19. All requests for religious diets must be submitted to the religion department on a religious-diet request form. (Id., ¶ 51.)

20. The food service department at NSP will place inmates on a non-pork/pork by-product diet upon approval from the religion department, and the food service department will attempt to accommodate other dietary modifications if requested by the religion department. (Id.)

21. Any request for diet modification must be on a form entitled "Religious Diet Request" and supported by written documentation regarding the appropriate religious doctrine. (Id.) Plaintiff has never submitted such a form, nor has he ever supported any diet request with appropriate written documentation. (Filing 40, Ex. 9, ¶ 5.)

22. Plaintiff did not claim to be a Seventh–Day Adventist when he entered prison. (Id., ¶ 2.) However, on September 19, 1989, Plaintiff requested to be put on a pork-free diet, claiming he was a Seventh–Day Adventist. He also requested a protein supplement "for a non-meat diet if possible." (Filing 40, Ex. 12, at 2.)

23. On September 22, 1989, Chaplain Rosenau approved Plaintiff's request for a pork-free diet, and Plaintiff was put on a pork-free diet. (Filing 40, Ex. 12.)

24. On April 21, 1991, Plaintiff requested a vegetarian diet because he was a "7th day Adventist." (Filing 40, Ex. 24.) The request contained no documentation supporting the religious claim. Chaplain Rosenau responded on May 2, 1991, stating that:

> I spoke with Howard Ferguson and Kathy Taylor concerning your request for an ovo-lacto vegetarian diet. The diet offered 7th Day Adventists, which you are approved for, is the pork free diet. This matches the Adventist prohibition of pork. That you choose to eat no meat is an individual choice and is not required by Adventism.[5] Kathy Taylor assures me that you may choose to eat no meat and still have ample nutrition by eating everything else provided with the meal. Our food service department is not able to offer diets based on individual preferences.

(Id.)

25. Control unit inmates are fed in their cells. On the morning of August 4, 1992, Plaintiff refused to return a bowl, despite a demand by Kipper. Plaintiff denied having the bowl. Kipper searched Plaintiff's cell, and the bowl was located in the cell. (Filing 40, Ex. 6, ¶¶ 2–4.) A misconduct report was issued by Kipper. (Id., ¶ 5; Filing 40, Ex. 27.)

26. On August 4, 1992, a nutri-loaf regimen was requested by Eggars and approved for Plaintiff by Hopkins and physician's assistant Danaher.[6] (Filing 40, Ex. 2, ¶ 3; Ex. 5, ¶ 11; Ex. 36.)

27. Plaintiff was fed nutri-loaf from lunch on August 4, 1992, until he received a regular meal at lunch on August 7, 1992. During this time, he never informed Defendants (or anyone else) that consumption of nutri-loaf violated his religious beliefs, (Filing 40, Ex. 1, ¶ 57; Ex. 2, ¶ 13; Ex. 3, ¶ 10; Ex. 4, ¶ 7; Ex. 5, ¶ 19; Ex. 6, ¶ 17; Ex. 7, ¶ 7; Ex. 11, ¶ 16; Ex. 42, ¶ 7), although Plaintiff's affidavit establishes that he told various NSP staff during this time that he did not eat meat. (Filing 46 Rayes Aff., ¶¶ 6–9.)

---

5. The chaplain's conclusion appears to be a correct statement of the beliefs of Seventh–Day Adventists; that is, abstinence from meat products is recommended, but it is not obligatory. See *LaFevers v. Saffle*, 936 F.2d 1117, 1119 (10th Cir.1991); *Butler v. Kavanagh*, 64 F.Supp. 741, 745 (E.D.Mich.1945).

6. A physician's assistant is a specially trained person who, although not a medical doctor, is authorized to "perform medical services when he or she renders such services under the supervision of a licensed physician." Neb.Rev.Stat. § 71–1,107.17 (Reissue 1990). The doctor need not be personally present to supervise the assistant at all times. Id.

28. At approximately 12:20 p.m. on August 4, 1992, Kipper was delivering medications. Plaintiff was asked whether he wanted his nutri-loaf, and he responded "yes." (Filing 40, Ex. 6, ¶ 8.) Kipper obtained the nutri-loaf and passed it together with the medications to Plaintiff in his cell. Plaintiff threw the nutri-loaf outside the cell, and Kipper wrote another misconduct report. (Id., ¶¶ 8, 10; Ex. 28.)

29. On August 5, 1992, another nutri-loaf regimen was requested by Eggars regarding the incident which took place during the noon hour on August 4, 1992, and deputy warden Kenney and physician's assistant Danaher approved the request. (Filing 40, Ex. 2, ¶ 5; Ex. 5, ¶ 12.)

30. Plaintiff was to be fed nutri-loaf for nine meals, beginning with lunch on August 7, 1992, and ending with the first regular meal being lunch on August 10, 1992, (Ex. 37). During this time, he never informed Defendants (or anyone else) that consumption of nutri-loaf violated his religious beliefs, (Filing 40, Ex. 1, ¶ 57; Ex. 2, ¶ 13; Ex. 3, ¶ 10; Ex. 4, ¶ 7; Ex. 5, ¶ 19; Ex. 6, ¶ 17; Ex. 7, ¶ 7; Ex. 11, ¶ 16; Ex. 42, ¶ 7), although Plaintiff's affidavit establishes that he told various NSP staff during this time that he did not eat meat. (Filing 46, ¶¶ 6–9.)

31. On Wednesday, August 5, 1992, Kipper was again delivering medications during the noon meal. Plaintiff was once again asked if he wanted his nutri-loaf, and he responded "yes." (Filing 40, Ex. 6, ¶ 8.) Plaintiff was given the nutri-loaf. As he had done before, he threw it out of his cell. (Id.) Kipper wrote a third misconduct report. (Id., ¶ 10; Ex. 29.)

32. Eggars requested a third nutri-loaf regimen, and it was approved by deputy warden Kenney, a doctor, and warden Hopkins on August 7, 1992. (Filing 40, Ex. 2, ¶ 7; Ex. 38.)

33. As a result of this third incident, Plaintiff was to be fed nutri-loaf for nine meals, although given the overlap between the second and third incidents, the third nutri-loaf regimen actually spanned less than nine meals; that is, from lunch on August 10, 1992, to the first regular meal next occurring as lunch on August 11, 1992. (Filing 40, Ex. 28.) During this time, Plaintiff never informed Defendants (or anyone else) that consumption of nutri-loaf violated his religious beliefs, (Filing 40, Ex. 1, ¶ 57; Ex. 2, ¶ 13; Ex. 3, ¶ 10; Ex. 4, ¶ 7; Ex. 5, ¶ 19; Ex. 6, ¶ 17; Ex. 7, ¶ 7; Ex. 11, ¶ 16; Ex. 42, ¶ 7), although Plaintiff's affidavit establishes that he told various NSP staff during this time that he did not eat meat. (Filing 46, ¶¶ 6–9.)

34. On August 5, 1992, Plaintiff submitted an interview request form addressed to the medical department, stating three things: (a) "I need a bottle of Gaviscon"; (b) "I have eaten nothing but salt past 3 day [sic] and am having blackout[s] ... dizzy"; and (c) "I have a sore [o]n my skin that is getting bigger no matter how many times I try squeezing it." (Filing 40, Ex. 26.) Plaintiff made no claim in the interview request form that eating the nutri-loaf violated his religious beliefs. (Id.)

35. Physician's assistant Danaher responded to Plaintiff on August 7, 1992, stating that: (a) Gaviscon [7] had been ordered as requested; (b) Plaintiff should eat the meals served and avoid salt; and (c) Plaintiff should not squeeze the sore and should keep it clean with soap and water. (Id.)

36. On August 5, 1992, Plaintiff attended a status review meeting which was also attended by NSP employee Schumucher and mental health counselor William. During this meeting, Plaintiff did not raise religious objections regarding nutri-loaf and he voiced no complaints about lack of medical care, although he did threaten both suicide and a lawsuit if the nutri-loaf regimen were not rescinded. (Filing 40, Ex. 4, ¶ 5; Ex. 7, ¶¶ 2–4.)

37. Except for the August 5, 1992, interview request addressed to the medical department, at no time did Plaintiff complain to any of the defendants that he needed and was being denied medical care regarding the nutri-loaf feeding regimen. (Filing 40, Ex. 1, ¶ 66; Ex. 2, ¶ 12; Ex. 3, ¶ 8; Ex. 4, ¶¶ 14–15;

---

7. Gaviscon is the brand name for an over-the-counter antacid medication manufactured by Marion Merrell Dow. Physicians' Desk Reference at 1297 (45th ed. 1991).

Ex. 6, ¶ 14; Ex. 7, ¶¶ 2–4, 6; Ex. 11, ¶ 17; Ex. 42, ¶ 5.)

38. On August 10, 1992, Plaintiff asked to see warden Hopkins regarding the nutri-loaf regimen, stating that he was being unfairly punished since on one occasion he was given a regular meal and there were "no problems." (Filing 40, Ex. 22.) Nowhere in the context of the interview request did Plaintiff state that he could not eat the nutri-loaf due to his religious beliefs or that he needed and was being denied medical care. (Id.)

39. The warden responded, stating, among other things, that the nutri-loaf was used as a means of control, not punishment; that the regular meal Plaintiff received was due to an oversight; and that the inmates on the nutri-loaf regimen are reviewed on a regular basis by administrative personnel. (Id.)

40. On August 14, 1992, Plaintiff submitted a grievance to Hopkins, complaining, among other things, that the food restriction "is a violation of Due Process & 14th Amendment and other constitutional rights," but Plaintiff did not state that he could not eat nutri-loaf based on his religious beliefs or that he was being denied needed medical care. (Filing 40, Ex. 20.)

41. At about 6:55 a.m. on Wednesday, August 19, 1992, Kipper was feeding the control unit inmates. Kipper handed Plaintiff a bowl of cereal. (Filing 40, Ex. 6, ¶ 11.) Plaintiff reached out the tray hatch and dumped the cereal onto the gallery floor, resulting in a fourth misconduct report from Kipper. (Id., ¶¶ 11–12; Ex. 30.)

42. At the request of Eggars and with the approval of deputy warden Kenney, warden Hopkins, and a doctor, Plaintiff was again subjected to the nutri-loaf regimen. (Filing 40, Ex. 39.) The regimen was to continue for nine meals beginning with lunch on August 19, 1992. (Id.)

43. On August 20, 1992, Plaintiff was admitted to the hospital at NSP—by the doctor who had approved the August 19, 1992, nutri-loaf regimen—so that he could be treated for

an infectious cyst on his left cheek. (Filing 40, Ex. 5, ¶ 17; Ex. 39; Defs.' Br. at 25.)

44. Upon admission to the hospital, Plaintiff complained of being dizzy and lightheaded. (Defs.' Br. at 25.)

45. Upon admission to the hospital, Plaintiff was placed on a general diet. (Id.)

46. There is no evidence in the record to indicate that Plaintiff complained during his hospital stay that eating nutri-loaf violated his religious beliefs, nor that he complained that he needed medical care which had been denied.

47. From the available records, it appears that the nutri-loaf Plaintiff received contained no pork, although it did contain other types of meat. (Filing 40, Exs. 14, 15.)

## II.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, discovery, and affidavits establish that there is no genuine issue of material fact for trial and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A judge's function at the summary-judgment stage is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). With these factors in mind, I turn to Plaintiff's claims.

## A.

Plaintiff's free-exercise-of-religion claim is predicated on the fact that he was fed nutri-loaf containing meat. He does not mount a per se challenge to the use of nutri-loaf on Eighth Amendment grounds, and, in any event, such a challenge would be unsuccessful on the facts of this case. *LeMaire v. Maass,* 2 F.3d at 861 (9th Cir.1993) (feeding nutri-loaf as a control measure for a limited period of time did not violate the Eighth Amendment.) [8]

---

**8.** Plaintiff received nutri-loaf for twenty meals between August 4, 1992, and August 11, 1992. He received nutri-loaf again on August 19, 1992, and August 20, 1992, before entering the hospital. The administration of nutri-loaf for a period not exceeding seven consecutive days was found

■ Normally, *if* a prisoner holds a sincere religious belief that conflicts with prison regulations, when the prisoner challenges those regulations, a trial court will review the actions of the prison using the four-part test set forth in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Iron Eyes v. Henry*, 907 F.2d 810, 812–813 (8th Cir.1990). However, before applying *Turner*, "the inmate must first establish the existence of a sincerely held religious belief, *and* that the challenged regulation [or conduct] infringes upon that belief." *Iron Eyes*, 907 F.2d at 813 (emphasis added).

■ At this stage of the proceedings, I am willing to assume the doubtful proposition that Plaintiff held a sincere religious belief that he should avoid meat of all kinds. *La-Fevers*, 936 F.2d at 1119; *Butler*, 64 F.Supp. at 745. However, the undisputed facts are insufficient to permit a rational finder of fact to conclude that the challenged regulations or Defendants' conduct infringed upon Plaintiff's religious beliefs inasmuch as Plaintiff never complained that consuming nutri-loaf violated his religious beliefs. In lay terms, Defendants could not honor a request that was unknown to them. In legal terms, giving all reasonable inferences to Plaintiff, the record would not support a finding that Defendants' conduct proximately caused a violation of Plaintiff's First Amendment religious rights.

Defendants' affidavits (Exs. 1–7, 11, 42) set forth with unmistakable clarity that Plaintiff never told anyone the nutri-loaf regimen violated his religious beliefs. Nor does Plaintiff claim in his affidavit that he told Defendants the nutri-loaf regimen violated his religious beliefs. (Filing 43.)

Plaintiff makes two arguments to rebut the conclusion that Defendants could not honor a request that was unknown to them. First, he argues that he told various people he did not eat meat while he was receiving the nutri-loaf. Second, he argues that because he made a request to the chaplain for a vegetarian diet sometime before the nutri-loaf incident, Defendants were aware of his religious views. Both arguments are unpersuasive.

Telling Defendants that Plaintiff did not eat meat is simply not the equivalent of telling them that he should not eat meat for religious reasons. In fact, Plaintiff's contemporaneous complaints to the prison officials were not that the nutri-loaf regimen violated his religious beliefs, but that the regimen constituted unfair punishment. (Exs. 16, 17, 18, 19, 20, 21, 22, 26.)

Moreover, the fact that Plaintiff asked the chaplain for a non-meat diet in May of 1991 could not and did not alert Defendants to an unstated religious complaint about nutri-loaf in August of 1992. Indeed, the chaplain's actions suggest that if NSP and Defendants had known of Plaintiff's religious complaint about nutri-loaf, an accommodation might perhaps have been made. In any event, since Defendants followed the chaplain's recommendation and did not feed him pork, Plaintiff cannot complain that Defendants fed him food with other types of meat when he made no religious complaint about such conduct.

The undisputed facts establish that when Plaintiff made any realistic attempt at communicating a religious concern about his diet, the prison tried to accommodate him. For example, although Plaintiff did not claim to be a Seventh–Day Adventist when he entered prison, he requested to be put on a pork-free diet on September 19, 1989, because he then claimed to be a Seventh–Day Adventist. He also requested a protein supplement "for a non-meat diet if possible."

---

not to have violated the Eighth Amendment in *Lemaire*, 2 F.3d at 860–862. Plaintiff notes that he received a regular meal on August 7, 1992. (Ex. 17.) Plaintiff states that he ate this meal and did nothing improper. He suggests that continued feeding of nutri-loaf after he had properly consumed a regular meal constituted punishment violative of state law. I do not agree. Plaintiff received the regular meal in error. (Ex.

1, ¶ 57.) In any event, his one-time compliance with the food regulations did not demonstrate sufficient assurance of continued compliance given the repeated violations that took place on August 4 and 5. That Plaintiff's conduct was likely to continue to be rebellious was borne out by his dumping cereal into the gallery on August 19, 1992.

Despite the fact that he had not submitted the appropriate form or appropriate documentation, Chaplain Rosenau approved a pork-free diet for Plaintiff on September 22, 1989. (Ex. 12.)

On April 21, 1991, Plaintiff requested a vegetarian diet because he was a "7th day Adventist." Despite the fact that the request contained no documentation supporting the religious claim, Chaplain Rosenau investigated the matter and suggested a reasonable accommodation—the pork-free diet previously provided Plaintiff could be consumed with Plaintiff not eating the meat since the diet would otherwise provide sufficient nutrition:

> I spoke with Howard Ferguson and Kathy Taylor concerning your request for an ovo-lacto vegetarian diet. The diet offered 7th Day Adventists, which you are approved for, is the pork free diet. This matches the Adventist prohibition of pork. That you choose to eat no meat is an individual choice and is not required by Adventism. Kathy Taylor assures me that you may choose to eat no meat and still have ample nutrition by eating everything else provided with the meal. Our food service department is not able to offer diets based on individual preferences.

(Ex. 24.)

The evidence further reveals that Defendants honored the diet approved for Plaintiff by the prison chaplain even when serving him the nutri-loaf. Although some of the nutri-loaf meals contained chicken, turkey, or hamburger, it is undisputed that the nutri-loaf was prepared consistent with the chaplain's instructions, that is, without pork. (Exs. 14, 15.)[9] Thus, since the nutri-loaf Defendants provided Plaintiff conformed to the diet approved by the chaplain, and since Plaintiff never made any religious objection to the contrary, Defendants had no reason to believe their conduct violated Plaintiff's religious beliefs.

Plaintiff evidently argues that because he asked the chaplain for vegetarian meals and the chaplain, although denying the request, told Plaintiff in May of 1991 that he could safely eat only the non-meat products when consuming regular meals that Defendants must have known in August of 1992 of his religious objections to meat of all kinds. I disagree.

There is simply no evidence that Defendants were aware of the precise terms of Plaintiff's correspondence with the chaplain or the chaplain's response. The record indicates only that the Defendants were aware that Plaintiff was to receive a non-pork diet. Thus, there is no reason to assume that Defendants were aware of Plaintiff's religious objection to eating meat of all kinds.

Furthermore, since Plaintiff did not request that the nutri-loaf be prepared without meat for religious reasons, there is simply no basis for concluding that Defendants insisted that it contain chicken, turkey, or hamburger. Indeed, given the previous efforts of Chaplain Rosenau, it is conceivable that the prison would have prepared the nutri-loaf without any meat products if Plaintiff had simply made known his religious complaints. However, one cannot know from this record what Defendants might have done because Plaintiff never complained that eating the nutri-loaf violated his religious beliefs. Thus, if Plaintiff's religious beliefs were violated, the violation was caused by his failure to communicate his religious objections rather than by Defendants' conduct or prison regulations.

In summary, there is no material fact in dispute about whether the Defendants' conduct or prison regulations impinged upon Plaintiff's religious beliefs. Neither Defendants' conduct nor prison regulations impinged upon Plaintiff's religious beliefs because he never communicated a religious objection to being fed the nutri-loaf. Defendants could not honor a request that was unknown to them; that is, Defendants' conduct was not the proximate cause of any injury to Plaintiff's First Amendment reli-

**9.** Exhibits 14 and 15 are for the time period from lunch on August 7, 1992, through lunch on August 11, 1992, and from lunch on August 19, 1992, through breakfast on August 20, 1992. Although there are no nutri-loaf preparation records for the time period between lunch on August 4, 1992, and breakfast on August 7, 1992, there is no reason to believe the prison would have deviated from its practice of not feeding Plaintiff pork or pork by-products:

gious rights. The motion for summary judgment must be granted as to the claim of free exercise of religion.

### B.

Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment because they failed to treat him when he allegedly became ill after not eating the nutri-loaf. The facts particularly pertinent to this allegation can be summarized as follows.

On August 5, 1992, Plaintiff submitted an interview request form addressed to the medical department, stating three things: (a) "I need a bottle of Gaviscon"; (b) "I have eaten nothing but salt past 3 day [*sic*] and am having blackout[s] ... dizzy"; and (c) "I have a sore on my skin that is getting bigger no matter how many times I try squeezing it." Plaintiff made no claim in the interview request form that eating the nutri-loaf violated his religious beliefs.

Physician's assistant Danaher responded to Plaintiff on August 7, 1992, stating that (a) Gaviscon had been ordered as requested; (b) Plaintiff should eat the meals served and avoid salt; and (c) Plaintiff should not squeeze the sore and should keep it clean with soap and water.

On August 20, 1992, Plaintiff was admitted to the hospital at NSP—by the doctor who had approved the August 19, 1992, nutri-loaf regimen—so that he could be treated for an infectious cyst on his left cheek. Upon admission to the hospital, Plaintiff complained of being dizzy and lightheaded.

Upon admission to the hospital, Plaintiff was placed on a general diet. There is no evidence to indicate that plaintiff complained at any time during his hospital stay that eating the nutri-loaf violated his religious beliefs, or that he complained that he needed medical care which was denied.

Except for the interview request of August 5, 1992, addressed to the medical department, at no time did Plaintiff complain to any of the defendants that he needed and was being denied medical care regarding the nutri-loaf feeding regimen.

■ Assuming for the sake of argument that Plaintiff has been damaged and that all of the defendants were acting under color of state law, in order for Plaintiff to prevail at trial on his Eighth Amendment medical claim, he must prove that: (1) he had a serious medical need; (2) Defendants were aware of that serious medical need; and (3) Defendants were deliberately indifferent to that serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit Instruction 4.04 (West 1993).

■ First, for the sake of argument, I assume that there is sufficient evidence in the record to make a disputed issue of material fact as to whether Plaintiff had a serious medical need for treatment on and after August 5, 1992, when he requested to see the medical department.

Second, as to all of the defendants except physician's assistant Danaher, there is no evidence whatever that Plaintiff advised any of the defendants that he was in need of medical attention regarding the nutri-loaf feeding regimen. On the contrary, Defendants' evidence establishes that Plaintiff made no medical complaints to any of them (except Danaher) regarding the nutri-loaf regimen. Accordingly, there is simply no factual basis for concluding that any of the defendants other than Danaher were aware of any serious medical need.

There is sufficient evidence to conclude that Danaher was aware of Plaintiff's medical complaint about food. Plaintiff wrote a request to see the medical department on August 5, stating that he had not eaten for three days, resulting in his having blackouts and being dizzy. Danaher responded on August 7.

Third, the uncontroverted evidence about what Danaher did or failed to do when he received Plaintiff's interview request form is not sufficient to create a material dispute for trial regarding deliberate indifference. "Deliberate indifference," as used in a medical case, is established only "if there is actual knowledge of a substantial risk that plaintiff has a serious medical problem and *if the defendant consciously refuses to take steps to*

*deal with the problem."* Manual of Model Civil Jury Instructions for the District Courts of the Eighth Circuit Instruction 4.04 comm. cmts. at 55 (citing *Campbell v. Greer,* 831 F.2d 700 (7th Cir.1987) (emphasis added)). ."Mere negligence or inadvertence does not constitute deliberate indifference." Instruction 4.04 comm. cmts., supra at 54 (citing *Campbell,* supra).

In this case, after Danaher received Plaintiff's interview request form complaining that he was sick after not eating anything but salt for three days, the physician's assistant told Plaintiff to eat and avoid salt. This was obviously sound medical advice, but even if it were not sound, it was sufficient evidence of action to preclude a finding that Danaher "consciously refuse[d] to take steps to deal with the problem." Moreover, since Plaintiff did not complain to Danaher (or anyone else) that eating the nutri-loaf would violate his religious beliefs, Danaher's prescription for food could not have been intended as some twisted form of punishment.

Since Danaher's conduct on August 7, 1992[10], cannot as a matter of law amount to deliberate indifference, and since there were no other medical complaints of being dizzy or the like from Plaintiff until he. was hospitalized for an infected cyst on August 20, 1992, at which time he was placed on a regular diet, summary judgment must be granted on the Eighth Amendment claim.

Accordingly,

IT IS ORDERED that:

(1) Defendants' motion for summary judgment (Filing 39) is granted;

(2) Judgment shall be entered for Defendants and against Plaintiff, providing that Plaintiff shall taking nothing on his federal claims, and the amended complaint is dismissed for lack of jurisdiction on the state-law claims.

---

10. Furthermore, the slight delay between the August 5, 1992 complaint and the August 7, 1992 response is far too short to create a trial issue regarding deliberate indifference. Moreover, any such delay is irrelevant because the advise would have been the same; that is, Plaintiff was to eat and avoid salt. Therefore, had there been no delay Plaintiff would still have suffered the claimed injury which is the subject of this action.