**Michael JENKINS, Plaintiff,**

v.

**WORLDCOM, INC., a Florida corporation, Defendant.**

**No. 8:98CV523.**

United States District Court,
D. Nebraska.

Oct. 27, 1999.

same issue. Upon reconsideration, however, the Court agrees with defendant and now alters its earlier ruling as stated above. *See Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.,* 48 F.3d 1066, 1070 (8th Cir.1995) (district court has the inherent power to reconsider or modify an interlocutory order any time before entry of a judgment); *Viehweg v. Mello,* 5 F.Supp.2d 752, 757 (E.D.Mo.1998) (same).

Robert F. Peterson, Laughlin, Peterson Law Firm, Omaha, NE, for Plaintiff.

John E. Hubbard, Trenten P. Bausch, Brian J. McGrath, Blackwell, Sanders Law Firm, Omaha, NE, for Defendant.

## MEMORANDUM AND ORDER

BATAILLON, District Judge.

### I.  Introduction

Before me are the defendant's motion (Filing No. 27) for summary judgment and the plaintiff's motion (Filing No. 30) for summary judgment. The plaintiff, a former employee of the defendant, filed suit to recover stock options which the plaintiff alleges vested when he left his position with the defendant. Both parties filed indexes of evidence (Filing Nos. 28 and 31, respectively) and submitted supporting and responsive briefs. I have reviewed the record, the parties' briefs and indexes, and the applicable law, and I conclude that both parties' motions for summary judgment should be denied.

### II.  Factual Background

MFS Communications, Inc., (MFS) hired the plaintiff in November 1993 as an engineer in its Chicago office. Under a 1993 Stock Plan, MFS granted the plaintiff stock option agreements (SOAs) on March 31, 1994; December 30, 1994; December 29, 1995; and December 31, 1996. Filing No. 17, Amended Complaint, Exs. A–D (hereafter, Amended Complaint).

Each SOA provided in relevant part that: 1) the options vested twenty percent at the end of the first year of the grant and five percent per quarter for the next four years, *id.*, Exs. A–D, ¶ 3.2; 2) the full number of option shares would vest immediately after a corporate "change of control" as a consequence of which the employee was involuntarily terminated within two years of the change of control, *id.*, Exs. A–B, ¶ 3.4, Exs. C–D, ¶ 3.5; and 3) an employee would forfeit unvested options upon resignation or if discharged other than for cause or other than as provided for in a change of control, *id.*, Exs. A–B, ¶ 5, Exs. C–D, ¶ 3.6.

The SOAs define "involuntary termination" to mean either actual or constructive involuntary termination. Constructive involuntary termination is further defined to include "(x) a material reduction in the Employee's compensation (including applicable fringe benefits), (y) the demotion or diminution in the Employee's position, authority, duties or responsibilities without cause or (z) the relocation of the Employee's principal place of employment, without consent." *Id.*, Exs. C–D, ¶ 10(b). The 1993 Stock Plan was amended in 1996 to provide that an employee's voluntary termination of employment had to occur within ninety days of the reduction in pay, demotion or diminution in authority or relocation of employment to qualify as a constructive termination. Filing No. 28, Defendant's Index of Evidence, Ex. 1, Aff. of Margaret Coons at 5, ¶ 19; Ex. B at 11, ¶ 13.3(c) (hereafter, Coons Aff.).

The SOAs each define "change of control" to mean either

(i) The acquisition (other than from the Company) by any person, entity or 'group,' within the meaning of Section 13(d)(3) or 14(d) (2) of the Securities Exchange Act of 1934 (the 'Exchange Act'), (exclusive, for this purpose, of the Company or its affiliates, or any employee benefit plan of the Company or its affiliates, which acquires beneficial ownership of voting securities of the Company) of beneficial ownership (within the meaning of Rule 13d–3 promulgated under the Exchange Act) of more than fifty percent (50%) of the then outstanding shares of common stock or the combined voting power of the Company's then outstanding voting securities entitled to vote generally in the election of directors; or

(ii) Approval by the stockholders of the Company of a reorganization, merger, or consolidation, in each case, with respect to which persons who were the stockholders of the Company immediately prior to such reorganization, merger or consolidation do not, immediately thereafter, own more than 50% of the combined voting power entitled to vote generally in the election of directors of the reorganized, merged or consolidated company's then outstanding voting securities, or a liquidation or dissolution of the Company or the sale of all or substantially all of the assets of the Company.

Amended Complaint, Exs. A–B, ¶ 10, Exs. C–D, ¶ 9(a). The parties do not dispute that MFS underwent a "change of control" when the defendant WorldCom, Inc., acquired MFS in December 1996 through a merger. Coons Aff. at 1, ¶ 3.

In September 1996, the plaintiff and MFS entered into a short-term assignment agreement requiring the plaintiff to spend six to twelve months working as an engineer in the United Kingdom. The plaintiff and MFS agreed that a new agreement would be necessary if the assignment extended beyond twelve months. Amended Complaint, Ex. E at 3. The agreement did not explicitly require the plaintiff to maintain his residence in the United States, but MFS did agree, among other things, to continue to pay him an annual salary of $56,000 for his engineering services, as well as to continue all benefits, including the company bonus plan, the health plan, social security, and the MFS stock option plan. In addition, MFS gave the plaintiff a per diem of $87 for meals, laundry, local transportation, and other incidentals; paid £1095 a month for a one-bedroom furnished apartment in London; paid all housing and utility costs including phone calls; and gave him another £400 a month in lieu of company-provided transportation. Filing No. 31, Plaintiff's Index of Evidence, Ex. 4, Dep. of Peg Breen, 15:16–24, Dep. Ex. 1 (hereafter, Breen Dep.). The plaintiff alleges that the monetary value of this compensation package was at least $89,955. Amended Complaint at 3, ¶ 6. The 1996 December merger did not affect the terms of the package. Breen Dep., 22:24—25:8.

In the fall of 1997, the defendant made several proposals to extend the plaintiff's employment in the United Kingdom, none of which the plaintiff accepted. While the final proposal dated October 3, 1997, did not reduce the plaintiff's base salary, it did delete several features of the 1996 short-term assignment agreement, including the $87 per diem and the housing allowance. In their place, the defendant offered a $7,864.27 "goods and services" differential, id., 41:9–14, which represented "the cost of a market basket of goods in your home location and the host location (London). This amount is based on [the plaintiff's] base salary and family size and is determined by a third party consultant." Id., Dep. Ex. 4, at 1. The defendant also proposed to deduct a "housing norm" of $11,642 from the plaintiff's base salary so that his housing and utilities costs were comparable to what he would have spent had he remained in the United States. Id., 41:2–8. "The housing norm is the portion of your base salary spent toward housing and utility costs had you remained at home. It is calculated based on average costs of housing for individuals with your salary and family size in the household." Id., Dep. Ex. 4, at 2.

These changes were necessary, the defendant maintains, to bring the plaintiff's compensation package in line with those given other WorldCom employees with expatriate assignments lasting more than one year. The 1997 long-term compensation package used a "balance sheet" approach to "maintain the employee's homeland level of compensation during the international assignment." Filing No. 28, Defendant's Index of Evidence, Ex. 2, Aff. of Peg Breen at 3, ¶ 13 (hereafter Breen Aff.). This balance sheet approach to international compensation assumes that

the cost of living abroad is going to be different than it is at home, and the approach that companies takes in paying individuals that go abroad is to account for those cost of living differences.... [A]n individual should neither benefit financially nor should they lose financially as a result of taking the assignment. Filing No. 34, Defendant's Index of Evidence Opposing Plaintiff's Motion for Summary Judgment, Ex. 5, Dep. of Martin Foxwell, 15:3–11 (hereafter, Foxwell Dep.). The employee becomes "responsible for those costs normally incurred in the home country, and the company makes up the difference because of the foreign venue's higher costs." Breen Aff. at 4, ¶ 15. MFS and WorldCom used the services of Organization Resources Counselors, Inc., (ORC) to determine if an employee with an international assignment needed money in addition to base salary to keep the same standard of living while on assignment. *Id.* at 3, ¶ 14. ORC measures the cost of living in 300 cities around the world and relates that cost back to employee's home country. Foxwell Dep., 15:12–25.

The plaintiff resigned his position with WorldCom on December 22, 1997. Coons Aff. at 6, ¶ 25. From the date of World-Com's first long-term assignment proposal in early September 1997 until his final day of employment, January 15,1998, the plaintiff was compensated under the terms and conditions of the short-term assignment agreement. Breen Dep., 24:2–8. On January 19, 1998, he began employment with Level 3 Communications, a WorldCom competitor started by the former chair and CEO of MFS. Coons Aff. at 5, ¶ 18; 6, ¶ 27; Filing No. 28, Defendant's Index of Evidence, Ex. 3, Dep. of Michael Jenkins, 6:11–13, 24–25; 7:1–19 (hereafter, Jenkins Dep.).

On March 13, 1998, the plaintiff attempted to exercise his stock options. Coons Aff. at 5, ¶ 21; Ex. G. When WorldCom denied his request for accelerated vesting of his unvested stock options, the plaintiff filed this suit. The plaintiff alleges that the switch from the "business trip" method of compensation to the "balance sheet"

approach represented a 39.5% reduction in the total compensation package that he had been receiving during his short-term assignment. Amended Complaint at 3, ¶ 8. The plaintiff further alleges that the defendant's proposed reduction in his compensation package constituted a constructive involuntary termination under the SOAs and that as a result, he was entitled to immediate vesting of all the stock options he held under the SOAs. Amended Complaint at 4, ¶ 9. The plaintiff alleges that the total net value of his stock options at the time of his termination was $125,020.30. *Id.*, ¶ 11.

Predictably, the defendant maintains that it would never have increased the plaintiff's annual compensation by almost forty percent merely because he was performing his job duties in a different country. Defendant's Reply Brief at 5. The defendant therefore argues that the plaintiff's compensation was not reduced so as to constitute a constructive involuntary termination triggering accelerated vesting of his stock options.

### III. Summary Judgment Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When viewing the evidence, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Since this case is before me on cross-motions for summary judgment, this rule has the end result that I take each side's facts in the light most favorable to that side. The trial court's "function at the summary judgment stage is not to weigh the evidence,

but to determine whether there is a genuine issue for trial." *Rayes v. Eggars,* 838 F.Supp. 1372, 1377 (D.Neb.1993) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505).

## IV. Discussion

### A. Material Reduction in Compensation

The defendant contends that the plaintiff is not entitled to the immediate vesting of the stock options at issue because the plaintiff was not subject to a constructive involuntary termination following a change in control. The defendant's argument is based on its belief that the compensation package offered to the plaintiff in connection with the indefinite extension of his assignment in the United Kingdom would not have resulted in a material reduction in compensation.

The defendant claims that after the merger, it adopted MFS's standing policy on expatriate compensation. Breen Aff. at 3, ¶ 9. Employees on long-term expatriate assignments, *i.e.,* those for more than one year, were compensated under a different formula than the "business trip" approach under which the plaintiff had been compensated during his short-term assignment. With long-term assignments, the defendant uses a "balance sheet" approach that attempts to maintain the employee's level of compensation at his or her "home" level during the international assignment.

The balance sheet approach allegedly would have paid the plaintiff "the same salary he would have received had he continued to work for the company in the U.S. and/or and [sic] had never participated in the short term assignment in the UK." Defendant's Brief in Support of Motion for Summary Judgment at 13 hereafter, Defendant's Brief). The defendant claims, therefore, that the plaintiff's compensation would not have been materially reduced by this alternate method of computing his compensation since he would have received the same compensation in the United Kingdom that he would have received in Chicago. The plaintiff's salary for his services did not change from one locale to the next.

What changed, the defendant argues, is the method for reimbursing the plaintiff for his expenses, since during the long-term assignment, the plaintiff was not expected to maintain a residence in the United States. Defendant's Reply Brief at 6; Breen Aff., Ex. A at 1, Ex. B. The defendant observes that to have allowed the plaintiff to continue to collect the $87 per diem into the second year of his assignment in the United Kingdom would have resulted in a windfall to him because he simply did not have to bear all the costs that a per diem is designed to cover. For example, the plaintiff lived in an apartment provided to him by the defendant and, as a consequence, did not have to eat every meal in a restaurant. The plaintiff thus simply pocketed most of the per diem.

Martin Foxwell of ORC said that a per diem is designed to be "an amount that's geared to enable an individual to dine in a restaurant for each meal as well as pay for miscellaneous expenses such as taxi rides around town and laundry, et cetera, functioning as an outsider, as a hotel dweller in that country." Foxwell Dep., 33:7–12. He described a per diem as a "direct reimbursement of expenses. That's not compensation for services rendered per se." Foxwell Dep., 34:10–12. The defendant thus contends that the per diem payments were not taxable income to the plaintiff, and should not be used to analyze whether there was a material reduction in compensation.

The plaintiff's position, however, is that his "bottom line compensation" consisted of both salary and fringe benefits such as the per diem, and that he received considerably more compensation during his short-term assignment than he would have earned under the defendant's long-term assignment offer. Plaintiff's Brief at 16. The plaintiff cites the Nebraska Wage Payment and Collection Act which defines "wages" to include "compensation for labor or services rendered by an employee, including fringe benefits, when previously agreed to and conditions stipulated have

been met by the employee, whether the amount is determined on a time, task, commission, or other basis." Neb.Rev. Stat. Ann. § 48–1229(4) (Michie 1995). The statute further defines "fringe benefit" to include "sick and vacation leave plans, disability income protection plans, retirement, pension, or profit-sharing plans, health and accident benefit plans, and any other employee benefit plans or benefit programs regardless of whether the employee participates in such plans or programs." Neb.Rev.Stat. Ann. § 1229(3) (Michie 1995).

The plaintiff notes that the per diem of $87 under the short-term package was worth $2,610 a month, compared to the goods and services differential worth only $655 a month under the long-term package. Likewise, the plaintiff had a housing budget of £1495 under the short-term package, but would have had a "housing norm" of $11,642 deducted from his base pay under the long-term package. Plaintiff's Brief Opposing Defendant's Motion for Summary Judgment and Supporting Plaintiff's Motion for Summary Judgment at 16 (hereafter Plaintiff's Brief).

The plaintiff alleges that the total monetary value of the short-term compensation package was $89,955. Amended Complaint at 3, ¶ 6. The defendant's calculations on its "ORC International Compensation Balance Sheet" show that the long-term package, before the $11,642 "housing norm" deduction, would offer the plaintiff $66,384.27 (annual base salary of $58,520 [1] plus a one-year goods and services differential of $7,864.27). Breen Dep., Ex., 4 at 4. The plaintiff's net compensation under the long-term package thus would have amounted to $43,919.27. *Id.*

The plaintiff's compensation expectations apparently were much higher. The plaintiff maintains that Clem Jones, a senior vice-president of engineering at MFS in 1996 when the plaintiff was first considering accepting the United Kingdom assignment, indicated to the plaintiff that the per diem would continue throughout the plaintiff's assignment. Jenkins Dep., 13:1–10. Jones also indicated to the plaintiff that his stay in the United Kingdom would last "a year to two years." *Id.* at 13:20.

I am not prepared to say as a matter of law that this disparity between the two compensation packages does or does not represent a material reduction in compensation sufficient to constitute a constructive involuntary termination and so trigger the accelerated vesting provisions of the SOAs. The Stock Plans, SOAs, and letters of understanding offer no clear resolution of the issue, even though the parties have each presented considerable probative evidence to support their positions.

I conclude that genuine issues of material fact remain for a jury to resolve. The plaintiff's evidence suggests that he had expectation interests with regard to continuation of the short-term compensation package during his extended assignment, but questions remain about whether those expectations were reasonable under the circumstances. The defendant's evidence suggests that a policy existed regarding compensation for long-term international assignments, but questions remain about whether and when the plaintiff learned about the policy. Section "C" below discusses these questions in more detail. Accordingly, I deny each party's motion for summary judgment because I find that a genuine issue of material fact exists on the issue of whether the defendant's proposed long-term package constituted a material reduction in the plaintiff's compensation such that a constructive involuntary termination occurred.

### B. Common Law–Constructive Discharge

The defendant argues that common law principles of constructive discharge preclude the plaintiff's recovery under the SOAs since constructive discharge can only occur when an employer "deliberately create[s] intolerable working conditions

---

1. The defendant received a merit raise during his short-term assignment.

with the intention of forcing the employee to quit" and the employee, as a reasonable person, does quit. *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996). The defendant cites two cases, neither from the Eighth Circuit, holding that a reduction in pay does not alone create intolerable work conditions that would force a reasonable person to resign. *Rosado v. Santiago*, 562 F.2d 114, 119 (1st Cir.1977) (salary indirectly reduced by increased commuting costs and post-transfer lack of per diem); *King v. AC & R Advertising*, 65 F.3d 764, 768 (9th Cir.1995) (proposed reduction in base salary from $235,-000 to $175,000 and proposed change in formula for calculating bonus).

The plaintiff observes, however, that these cases are inapposite since the SOAs define the term "constructive involuntary termination" and establish the conditions under which it can occur: a material reduction in compensation after a "change of control," a term also defined in the SOAs. I agree with the plaintiff that the employment discrimination cases discussing constructive discharge cited by the defendant have no place in the resolution of the contract issues present in this case. Accordingly, the defendant's motion for summary judgment as based on the issue of common law constructive discharge is denied.

### C. Timing of Change of Control

The defendant argues that the compensation guidelines in the 1993 Stock Plan and the terms of the plaintiff's September 1996 short-term assignment agreement—both operating before the change of control occurred in December 1996—dictated the decision to "reduce" the plaintiff's salary in the September 1997 long-term agreement. Defendant's Brief at 18. As a consequence, the defendant maintains, the plaintiff cannot establish that his stock options should have accelerated under the SOAs because 1) the 1993 Stock Plan allowed accelerated vesting only in the event of a change of control and the employee's subsequent constructive involuntary termination within two years thereafter, and 2)

the September 1996 short-term assignment agreement plainly contemplated that a new agreement would be required. The defendant states that the long-term compensation package proposed in the September 1997 letter merely followed the terms of the 1996 agreement and pre-existing company policy on compensation for long-term assignments.

This pre-existing policy, however, is not mentioned or even hinted at in the 1996 short-term agreement, nor is it discussed in the SOAs. In fact, the only documentary evidence before me that such a plan existed is one sheet behind a MFS cover sheet labeled, "International Assignment Policy: Guidelines to facilitate the free movement of Human Resources to support globalization strategies in a competitive and cost effective manner." Breen Aff., Ex. C. The discussion under the "Compensation: Base Salary" heading does tell employees that they "should not automatically expect a salary increase solely on account of an international transfer," and that "Home Country housing/utilities contributions will be deducted from base salary," but nowhere does the discussion indicate that employees should expect a drop in their compensation if their short-term international assignment was extended beyond one year.

The defendant told the plaintiff in December 1997 that the long-term package with reduced compensation was not negotiable, Breen Dep., 51:16—52:11, with the result that he would be expected to do the same work he had been doing for the previous year for less money. I therefore conclude that genuine issues of material fact remain about whether the plaintiff knew a different, less generous compensation package governed stays longer than a year and about whether the defendant's proposed long-term package constituted a material reduction in the plaintiff's compensation such that a constructive involuntary termination occurred.

### D. Board of Directors' Decision

The defendant also argues that under the terms of the 1993 Stock Plan, the decision of the Board of Directors' Compensation Committee that the plaintiff was not subject to a constructive involuntary termination and hence was not entitled to accelerated vesting of his unvested stock options is final and binding. The Stock Plan provides that the committee has "plenary authority in its discretion, but subject to the express provisions of the Plan, to determine the terms of all Benefits under the Plan." Coons Aff., Ex A at 6, Art. X, "Administration." The Stock Plan also provides that the decision of the Compensation Committee is "final and binding" should a disagreement arise about "the interpretation of the Plan or any amendment hereto or any rule, regulation or procedure thereunder or as to any right or obligation arising from or related to the Plan." *Id.* at 7. The defendant contends that this language assures the committee's decisions about eligibility for benefits and construction of the terms of the Plan may only be overturned if they are "arbitrary, capricious or made in bad faith, not supported by substantial evidence, or erroneous on a question of law." Defendant's Brief at 18 (*quoting Administrative Comm. of the Sea Ray Employees' Stock Ownership & Profit Sharing Plan v. Robinson,* 164 F.3d 981, 985–86 (6th Cir.1999)).

■ The defendant draws this "arbitrary and capricious" standard from cases brought under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* I will not adjudicate this alleged breach of contract solely on the basis of ERISA precedents because the possibility that ERISA might govern the award of benefits under the SOAs has not been addressed either in the pleadings or the briefs,. Consequently, I deny the motions for summary judgment on the issue of whether the Compensation Committee of the defendant's board of directors had final and binding authority to deny the plaintiff's entitlement to accelerated vesting.

### E. Late Exercise of Options

The defendant also argues that because the plaintiff's voluntary resignation on January 15, 1998, was more than ninety days after he learned of the alleged reduction of his compensation proposed in the long-term package on September 9, 1997, he is not entitled to accelerated vesting of his stock options. The 1993 Stock Plan (as amended in December 1996) provides that a constructive involuntary termination following a change in control occurs within ninety days of a material reduction in an employee's compensation, the employee's demotion or diminution in authority or position, or the employee's relocation. Coons Aff., Ex. B at 11, Art. XIII, "Changes to Company Stock; Change in Control of the Company," ¶ 13.3(c).

The plaintiff maintains that the parties negotiated about the terms of the long-term assignment after he received the September 9 proposal, and that it was not until the defendant issued its "take it or leave it" ultimatum in December 1997 with regard to the October 3, 1997, proposal that "the plaintiff acquired the standing to complain of a reduction in salary and resign in the face of. the reduction." Plaintiff's Brief at 21–22. The plaintiff argues that when he resigned on December 22, 1997, within days of receiving the defendant's final proposal, he was well within the ninety-day limit set in the 1993 Stock Plan.

■ I agree. Because no genuine issue of material fact exists about the date of the plaintiff's resignation following the defendant's final proposal, I conclude that the plaintiff is entitled to summary judgment on the issue of whether he timely exercised his option.

### F. SOA of December 31, 1996

Finally, the defendant argues that the plaintiff is not entitled to vesting of the December 31, 1996, SOA because the grant of the stock option in that SOA took place after WorldCom had acquired MFS. MFS

stockholders approved the merger of the two entities on December 20, 1996.

The defendant claims that all MFS employees entitled to the December 31, 1996, grant received a letter from the chair and CEO of MFS telling them that the "grant was made subsequent to the change and [sic] control was not covered by the change in control language found in the amended MFS 1993 Stock Plan." Coons Aff. at 5, ¶ 18. This letter does not appear in either of the defendant's indexes of evidence. As the plaintiff points out, however, the December 31, 1999, SOA plainly states that it is between the plaintiff and MFS. Coons Aff., Ex. F at 1. The agreement nowhere refers to the defendant WorldCom.

On the basis of this scanty but directly conflicting evidence, I am not prepared to grant summary judgment on this issue to either party. The parties' motions for summary judgment are consequently denied. Accordingly,

IT IS ORDERED that

1. The defendant's motion (Filing No. 27) for summary judgment is denied;

2. The plaintiff's motion (Filing No. 30) for summary judgment is granted as to the issue of whether he timely exercised his option, but denied as to all other issues.